## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| Marla Knudsen and William Dutra, as the representatives of a class of similarly situated persons, and on behalf of the MetLife Options & Choices Plan, | Case No. |
| Plaintiffs, | **COMPLAINT** |
| v. | **CLASS ACTION** |
| MetLife Group, Inc., | |
| Defendant. | |

### NATURE OF THE ACTION

1.      Named Plaintiffs Marla Knudsen and William Dutra ("Plaintiffs"), as the representatives of the Class described herein, and on behalf of the and on behalf of the MetLife Options & Choices Plan (the "Plan"), bring this action pursuant to the Employee Retirement Income Security Act, 29 U.S.C. § 1001 *et seq.* ("ERISA"), against Defendant MetLife Group, Inc. ("MetLife" or "Defendant"), the fiduciary of the Plan.

2.      As described herein, Defendant violated ERISA by diverting tens of millions in drug rebates from the Plan to itself.

3.      Between 2016 and 2021, the Plan earned approximately $65 million in drug rebates. Defendant caused 100% of that money to be paid to itself in breach of its fiduciary duties. The rebates should have been retained by the Plan and allocated to Plan participants in proportion to their contributions and otherwise used for participants' benefit.

4.      Plaintiffs are former Plan participants. They bring this action pursuant to 29 U.S.C. §§ 1104, 1106 & 1132(a)(2)-(3) to remedy Defendant's unlawful conduct, recover losses to the Plan, and obtain other appropriate relief.

## JURISDICTION AND VENUE

5.      Plaintiffs bring this action pursuant to 29 U.S.C. § 1132(a)(2) and (3), which entitles participants in an employee benefit plan to pursue a civil action on behalf of a plan to remedy violations of ERISA and to obtain monetary and appropriate equitable relief.

6.      This case presents a federal question under ERISA and, therefore, this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(1).

7.      Venue is proper in this district pursuant to 29 U.S.C. § 1132(e)(2) because the Plan was administered in this District and Defendant breached its fiduciary duties in this district.

## PARTIES

### DEFENDANT

8.      Defendant is the principal U.S. employer of insurance and financial services companies owned by MetLife Inc.

9.      Defendant sponsors the Plan to provide health and welfare benefits to its employees and employees of its affiliates and their families.

10.      Defendant is the "named fiduciary" of the Plan within the meaning of 29 U.S.C. § 1102(a) and the "administrator" of the Plan within the meaning of 29 U.S.C. § 1002(16)(A).

11.      Defendant acts as a fiduciary of the Plan within the meaning of 29 U.S.C. § 1002(21)(A) because, *inter alia*, Defendant exercises discretionary authority and control over the disposition of drug rebates owed to the Plan.

12.     Defendant is a "party-in-interest" to the Plan within the meaning of 29 U.S.C. § 1002(14)(A) and (C) because it is the fiduciary, administrator, and employer of the Plan.

## PLAINTIFFS

13.     Plaintiff Marla Knudsen worked for MetLife from January 1, 2013, through October 18, 2021 as a Client Service Consultant. While employed by Metlife, Ms. Knudsen participated in the Plan. Specifically, Ms. Knudsen obtained medical and prescription drug coverage for herself and her dependents through the Plan. Ms. Knudsen paid, through payroll deductions from her compensation, approximately $400 per month pursuant to MetLife's policy requiring employees to pay a fixed percentage (depending on job title and coverage type) of overall contributions for spousal and dependent coverage. Ms. Knudsen also paid deductibles, co-pays, and/or co-insurance for prescriptions drugs in circumstances in which the Plan did not cover 100% of the cost of the prescription.

14.     Plaintiff William Dutra worked for MetLife from October 2000 through March 31, 2017, as a Financial Advisor. While employed by Metlife, Mr. Dutra participated in the Plan. Specifically, Mr. Dutra obtained medical and prescription drug coverage for himself and his spouse through the Plan. As of 2017, Mr. Dutra paid, through payroll deductions from his compensation, approximately $500 per month to the Plan in order to obtain health insurance coverage for his wife and daughter, pursuant to MetLife's policy of requiring employees to pay a fixed percentage (depending on job title and coverage type) of contributions for spousal and dependent coverage. Mr. Dutra also paid deductibles, co-pays, and/or co-insurance for prescriptions drugs in circumstances in which the Plan did not cover 100% of the cost of the prescription.

## THE PLAN

15.    Established January 1, 1992, the Plan provides medical, prescription drug, dental, disability, life insurance, and other benefits to eligible active, disabled, and retired employees of Defendant and Defendant's affiliates and their families.

16.    As of December 31, 2021, the Plan had a total of 36,962 participants and over $1.4 billion in assets.

17.    The Plan has the following participating affiliates: Metropolitan Life Insurance Company, Metropolitan Property and Casualty Insurance Company (also authorized to transact business as Metropolitan Property and Liability Insurance Company), MetLife Credit Corp., MetLife Funding, Inc., and SafeGuard Health Plans, Inc. (California). Beginning on January 8, 2020, PetFirst Healthcare LLC became a participating affiliate in the Plan.

18.    For core medical benefits, Plan participants choose between several coverage options offered under the Plan. Each coverage option includes a prescription drug benefit, which pays part or all of the cost of prescription drugs.

19.    The Plan is self-funded, meaning that benefits are paid by a trust holding plan assets or by the employer, and not by a third-party insurance company. "Under a 'self-funded' plan, the insurance company 'acts only as a third-party administrator; the employer is responsible for paying claims [out of the employees' contributions] and bearing the financial risk.'" *Depot, Inc. v. Caring for Montanans, Inc.*, 915 F.3d 643, 658 (9th Cir. 2019) (quoting *N. Cypress Med. Ctr. Operating Co., Ltd. v. Aetna Life Ins. Co.*, 898 F.3d 461, 468 (5th Cir. 2018)).

20.    To fund the Plan, each year Defendant determines the overall cost of coverage for each medical benefit option, inclusive of the prescription drug component contained within each option. Defendant then reduces this figure to a specific contribution or premium for each

employee, spouse, and dependent. Participants electing spousal or dependent coverage are then charged a percentage of that total premium, depending upon the fixed formula determined by Defendant, which is then deducted each pay period. Defendant or its affiliates pay the balance of the cost of coverage. The overall level of premiums and the amount charged to participants is determined based on the cost of "projected medical claims." *ZT Employment Servs., LLC v. Gallagher Benefit Servs., Inc.*, 2021 WL 1199579, at *1 (S.D. Tex. Mar. 30, 2021). *Cf. Ironworkers Local Union 68 v. AstraZeneca Pharmaceuticals, LP*, 634 F.3d 1352, 1368 (11th Cir. 2011) (explaining that sponsors of self-funded plans "adjust[] their premiums upward to reflect the projected value of claims for [heightened prescription drug costs]").

21.    After collecting the employee portion of the cost of coverage, Defendant transfers the total cost of coverage to several trust funds held by the Plan. During the last five years, Plan participants have paid, on average, around 30% of overall contributions to the Plan. The Plan is funded through these employee and employer contributions.

22.    After taking account of any co-pay, co-insurance, or deductible paid outside the Plan, the Plan pays claims, including prescription drug claims, from the trust funds. Throughout the relevant period, the Plan hired Express Scripts as the Plan's pharmacy benefit manager ("PBM"), paying compensation that ranged from $3.2 million to $6.3 million per year, according to the Plan's 5500s.

### DEFENDANT'S UNLAWFUL CONDUCT

*ERISA Fiduciary Standard and Handling Plan Assets*

23.    ERISA requires plan fiduciaries to act:

(1) "solely in the interest of the participants and beneficiaries,"

5

(2) "for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the plan," and

(3) "with the care, skill, prudence, and diligence" of prudence person under like circumstances. 29 U.S.C. § 1104(a)(1)(A)–(B).

24.    ERISA fiduciaries also must refrain from prohibited transactions. A fiduciary may not cause a Plan to transfer assets to a party-in-interest or deal with Plan assets in its own interest. 29 U.S.C. § 1106(a)–(b). An employer who transfers plan assets to itself violates ERISA's anti-inurement provision. *See* U.S. Department of Labor, Advisory Opinion 1994–31A (Sept. 9, 1994)[1]; 29 U.S.C. § 1103(a), (c).

25.    Because the Plan is self-funded, participant contributions constitute assets of the Plan. 29 C.F.R. § 2510.3–102; *Depot, Inc. v. Caring for Montanans, Inc.*, 915 F.3d 643, 658 (9th Cir. 2019) ("Premiums paid under a self-funded plan are therefore contributions from employees earmarked and held in trust by the employer for the employees' later benefit [and are] therefore assets of the plan."). Similarly, employer contributions become plan assets once they have been contributed to the Plan. Employee Benefits Sec. Admin., U.S. Department of Labor, Field Assistance Bulletin 2008–1, at 1–2 (Feb. 1, 2008)[2]; *In re Halpin*, 566 F.3d 286, 289 (2d Cir. 2009).

*Background on Prescription Drug Rebates*

26.    Pharmacy benefits managers ("PBMs") are in the business of managing pharmacy benefits for health plans.

---

[1] Available at https://www.dol.gov/agencies/ebsa/about-ebsa/our-activities/resource-center/advisory-opinions/1994-31a.
[2] Available at https://www.dol.gov/agencies/ebsa/employers-and-advisers/guidance/field-assistance-bulletins/2008-01.

27.    "PBMs are the 800–pound gorillas of pharmaceutical reimbursement." *In re Pharmaceutical Industry Average Wholesale Price Litigation*, 230 F.R.D 61, 71 (D. Mass. 2005). It is common for PBMs to negotiate volume discounts and rebates with drug manufacturers. All or a portion of the rebate is typically made available to the client plan to spend at the discretion of the plan fiduciary. *See* Advisory Council on Employee Welfare and Pension Benefit Plans, PBM Compensation and Fee Disclosure (Nov. 2014) ("[T]he vast majority of drug manufacturer rebates are shared with benefit plans.").[3]

28.    Wherever a service provider is hired to administer or manage all or part of an ERISA plan, the process of hiring that provider and negotiating the terms of service are fiduciary acts. *See* Department of Labor, Understanding Your Fiduciary Duties Under a Group Health Plan, at 4 (Sept. 2019).[4] Because the service provider owes no fiduciary duties at the point they are hired, "discretionary control over plan management lies not with the service provider but with the trustee, who decides whether to agree to the service provider's terms." *Santomenno ex rel. John Hancock Trust v. John Hancock Life Ins. Co. (U.S.A.)*, 768 F.3d 284, 293 (3d Cir. 2014). Thus, in both hiring Express Scripts Inc. as the Plan's PBM and negotiating how rebates would be handled, MetLife was acting in a fiduciary capacity.

29.    The PBM contract negotiated by Defendant was itself a plan asset. "[T]he assets of a welfare plan would include any property, tangible or intangible, in which the plan has a beneficial ownership interest." Department of Labor Advisory Opinion No. 93-14a.[5] The Plan had a

---

[3] Available at https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/about-us/erisa-advisory-council/2014-pbm-compensation-and-fee-disclosure.pdf.

[4] Available at https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/understanding-your-fiduciary-responsibilities-under-a-group-health-plan.pdf.

[5] Available at https://www.dol.gov/agencies/ebsa/about-ebsa/our-activities/resource-center/advisory-opinions/1993-14a.

beneficial interest in the contract given that, according to the 5500s filed by Defendant, the cost of hiring Express Scripts as a pharmacy benefit manager were paid by the Plan. Accordingly, "[c]ourts have considered insurance policies or contracts to be plan assets under ERISA." *Mohr-Lercara v. Oxford Health Ins., Inc.*, 2019 WL 1409479, at *8 (S.D.N.Y. March 28, 2019); *Fechter v. Conn. Gen. Life Ins. Co.*, 800 F. Supp. 182, 200 (E.D. Pa. 1992) (explaining that "an insurance policy itself is a plan asset"). Accordingly, a contract to manage and administer prescription drug benefits and negotiate drug prices is itself a plan asset. *Negron v. Cigna Health & Life Ins.*, 300 F. Supp. 341, 358 (D. Conn. 2018) (concluding that agreement to administer prescription drug benefits was a plan benefit such that exertion of discretionary control over the contract confers fiduciary status).

30.     Accordingly, because the PBM contract was negotiated by Defendant while it was acting in a fiduciary capacity, and the contract itself was a plan asset, the rebates generated by the contract were also plan assets. Though ERISA does not define the term "plan assets", courts apply a functional approach, under which "that "plan assets" include "items a defendant holds or receives: (1) as a result of its status as a fiduciary or its exercise of fiduciary discretion or authority, and (2) at the expense of plan participants or beneficiaries." *Negron*, 300 F. Supp. 3d at 358; *see Edmonson v. Lincoln Nat'l Life Ins. Co.*, 725 F.3d 406, 429 (3d Cir. 2013) (stating that this functional approach is a helpful means of determining whether items are plan assets). Rebates generated by the Plan's PBM contract are thus plan assets because they were received as a result of MetLife's exercise of its fiduciary authority in entering into the PBM contract and/or allocating the rebates, and were obtained at the expense of plan participants, both because participants paid a portion of the PBM's compensation, and because MetLife's transfer of rebates to itself reduced the assets available to provide benefits, necessarily resulting in higher premiums. *See supra* ¶ 20.

*Defendants' Diversion of Drug Rebates from the Plan*

31.     Between 2016 and 2021, the Plan was credited with approximately $65 million in drug rebates pursuant to its contract with Express Scripts. Below is a chart illustrating the drug rebates due to the Plan, as reported by Defendant in annual Department of Labor filings:

| Year | Drug Rebates Due to the Plan |
|:---:|:---:|
| 2021 | $7,875,482 |
| 2020 | $16,628,742 |
| 2019 | $10,033,830 |
| 2018 | $14,633,201 |
| 2017 | $6,839,803 |
| 2016 | $9,226,321 |
| **Total** | **$65,237,379** |

32.     The Plan claims drug rebates as an asset of the Plan. The below screenshot taken from the Plan's Department of Labor filings is illustrative, showing 2020 and 2021 drug rebates as a "receivable" owned by the Plan:

**MetLife Options and Choices Plan**

Statements of Net Assets Available for Benefits

| | As of December 31, | |
|---|---|---|
| | 2021 | 2020 |
| **Assets:** | | |
| Investments at fair value: | | |
| Group flexible premium variable life insurance policy | $ 962,080,495 | $ 976,804,142 |
| Life insurance funding account | 324,037,151 | 345,144,419 |
| Fixed maturity securities | 4,234,324 | 1,346,856 |
| Mutual funds | 112,656,415 | 130,231,580 |
| Total investments | 1,403,008,385 | 1,453,526,997 |
| | | |
| Net assets held in MetLife Retirement Plan | | |
| restricted for 401(h) account | 73,000,664 | 95,161,865 |
| Cash and cash equivalents | 13,288,934 | 6,008,506 |
| Premium stabilization reserve | 3,676,252 | 4,546,926 |
| **Receivables:** | | |
| Drug rebates | 7,875,482 | 16,628,742 |
| Administrative fees | 167,649 | 174,669 |
| Participant contributions | 1,168,663 | 1,100,766 |
| Fixed maturity securities interest | 2,551 | 2,628 |
| Total receivables | 9,214,345 | 17,906,805 |
| **Total Assets** | 1,502,188,580 | 1,577,151,099 |

33.    Defendant then directs 100% of the Plan's drug rebates to be paid to itself. In the Plan's annual reporting, each drug rebate receivable owned by the Plan is offset, to the dollar, by a liability to Defendant:

| **Liabilities:** | | |
|---|---|---|
| Participant contributions due to Sponsor | 1,168,663 | 1,100,766 |
| Rebates due to Sponsor | 7,875,482 | 16,628,742 |
| Administrative fees payable | 167,649 | 174,669 |
| **Total Liabilities** | 9,211,794 | 17,904,177 |

34.    While Defendant transferred PBM rebates to itself, it provided no such benefit to Plaintiffs or other participants, who were responsible for paying 30% of annual contributions to the Plan. Nor did the Plan receive any benefit from this transfer. Instead, the benefit accrued entirely to Defendant.

35.    Defendant's practice of allocating 100% of Plan drug rebates to itself violates ERISA in multiple ways. First, Plan assets are required to be held in trust, and transferring the

rebates to Defendant violates ERISA's anti-inurement provision. *See supra* ¶ 24. Second, Defendant's transfer of Plan assets to itself violates ERISA's prohibition against transfers of assets by a plan to a party-in-interest. *Id.* Third, Defendant's transfer of Plan assets to itself constitutes prohibited fiduciary self-dealing for its own account. *Id.*; *Acosta v. WH Administrators, Inc.*, 449 F. Supp. 3d 506, 513, 517, 520 (D. Md. 2020) (fiduciary's receipt of 50% of PBM rebates constituted prohibited fiduciary self-dealing and breach of fiduciary duties). Fourth, Defendant's failure to act in the best interest of participants and exercise due care and diligence in hiring Express Scripts and negotiating the terms of the PBM contract fail to satisfy ERISA's duties of loyalty and care. *Id.*; *supra* ¶¶ 23, 28. Defendant needed to follow a prudent, impartial process for retaining a PBM, negotiating the contractual terms, and allocating drug rebates. Defendant's mechanical allocation of the entire rebate to itself despite substantial participant contributions to the rebated funds and its duty to hold the funds in trust, Defendant did not follow a prudent and loyal process for allocating drug rebates.

*Effect on Plaintiffs and the Class*

36.     If Defendants had followed an appropriate fiduciary process for determining how to allocate drug rebates, there are multiple benefits to Plaintiffs and the Class that would have been received. *First*, it may have been consistent with its fiduciary duties for Defendant to reduce ongoing contributions on account of the rebates collected by the Plan. *Second*, may have been reduced co-pays and co-insurance for pharmaceutical benefits. *Third*, Defendants may have distributed rebates to participants in proportion to their contributions to the Plan.

37.     Due to Defendant's transfer of drug rebates to itself, Plaintiffs and the Class did not receive these benefits, and therefore paid excessive amounts toward the cost of coverage, co-pays, and/or co-insurance, and have otherwise been denied their equitable interest in Plan drug rebates.

*Plaintiffs' Lack of Actual Knowledge*

38.     Plaintiffs' positions at MetLife did not involve the company's health plan, employee benefits, or drug rebates. Plaintiffs did not have actual knowledge of the Plan's entitlement to drug rebates or Defendant's direction of those rebates to itself until shortly before this lawsuit was filed. Prior to formal discovery in this case, Plaintiffs do not have access to insider information related to Defendant's allocation or use of drug rebates and the process (or lack thereof) that Defendants followed. Plaintiffs' allegations are based on public filings by the Plan, their experience as Plan participants, and reasonable inferences from the information available at this stage.

## **PLAN-WIDE RELIEF**

39.     29 U.S.C. § 1132(a)(2) authorizes any participant or beneficiary of the Plan to bring an action on behalf of the Plan to obtain for the Plan the remedies provided by 29 U.S.C. § 1109(a). Plaintiffs seek recovery on behalf of the Plan pursuant to this statutory provision (in addition to relief under 29 U.S.C. § 1132(a)(3)).

40.     Plaintiffs seek recovery for injuries to the Plan due to Defendant's fiduciary breaches during the statutory period and, also, seek equitable relief on behalf of the Plan as a whole (and equitable relief on behalf of each Class member individually).

41.     Plaintiffs are adequate to bring this derivative action on behalf of the Plan, and their interests are aligned with the Plan's other participants and beneficiaries. Plaintiffs do not have any conflicts of interest with any participants or beneficiaries that would impair or impede their ability to pursue this action. Plaintiffs have retained counsel experienced in ERISA litigation and intend to pursue this action vigorously on behalf of the Plan.

## CLASS ACTION ALLEGATIONS

42.    Plaintiffs additionally and alternatively seeks certification of this action as a class

action pursuant to Fed. R. Civ. P. 23.

43.    Plaintiffs asserts their claims on behalf of the Class of participants and beneficiaries

of the Plan defined as follows:

> All participants and beneficiaries of the Plan since January 24, 2017,
> excluding Defendant and any persons who exercised discretion or control
> with respect to allocation of Plan drug rebates.

44.    <u>Numerosity</u>: The Class is so numerous that joinder of all Class members is

impracticable.  The Plan has more than 30,000 participants.

45.    <u>Typicality</u>:    The Named Plaintiffs' claims are typical of the Class members'

claims. Like other Class members, the Named Plaintiffs were Plan participants and suffered

injuries due to Defendant's violations of ERISA. Defendant treated the Named Plaintiffs

consistently with other Class members with regard to the Plan in denying them any interest in Plan

drug rebates.

46.    <u>Adequacy</u>:    Plaintiffs will fairly and adequately protect the interests of the Class.

Plaintiffs' interests are aligned with the Class that they seek to represent, and they have retained

counsel experienced in complex class action litigation, including ERISA litigation. Plaintiffs do

not have any conflicts of interest with any Class members that would impair or impede their ability

to represent such Class members.

47.    <u>Commonality</u>: Common questions of law and fact exist as to all Class members and

predominate over any questions solely affecting individual Class members, including but not

limited to:

a.    Whether Defendant was a fiduciary with respect to the Plan;

b.     Whether Defendant was acting as a fiduciary when retaining the Plan's PBM and negotiating the terms of the engagement.

c.     Whether Defendant breached its fiduciary duties and otherwise violated ERISA in connection with its actions taken with respect to Plan drug rebates;

d.     Whether the PBM contract was a Plan asset;

e.     Whether the rebates paid by the PBM were Plan assets;

f.     The proper form of equitable relief; and

g.     The proper measure of monetary relief.

48.     Class certification is appropriate under Fed. R. Civ. P. 23(b)(1)(A) because prosecuting separate actions against Defendant would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for Defendant.

49.     Class certification is also appropriate under Fed. R. Civ. P. 23(b)(1)(B) because adjudications with respect to individual Class members, as a practical matter, would be dispositive of the interests of the other persons not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests. Any award of equitable relief by the Court, such as allocation of wrongfully retained funds to participants, would be dispositive of the interests of all participants.

50.     Class certification is also appropriate under Fed. R. Civ. P. 23(b)(3) because questions of law and fact common to the Class predominate over any questions affecting only individual Class members, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation. Defendant's conduct as described in this Complaint applied uniformly to all members of the Class. Class members do not have an interest in pursuing separate actions against Defendant, as the amount of each Class member's individual claims is

relatively small compared to the expense and burden of prosecuting claims of this nature. Class certification also will obviate the need for unduly duplicative litigation that might result in inconsistent judgments concerning Defendant's actions. Moreover, management of this action as a class action will not present any likely difficulties. In the interests of justice and judicial efficiency, it would be desirable to concentrate the litigation of all Class members' claims in a single forum.

51.      Plaintiffs and undersigned counsel will provide notice to the Class to the extent required by Fed. R. Civ. P. 23(c)(2) and the Court.

**<u>COUNT I</u>**
**Violation of ERISA's Trust and Anti-Inurement Provisions**
**29 U.S.C. § 1103(a), (c)**

52.      Plaintiffs incorporate by reference the foregoing paragraphs as though fully stated herein.

53.      Defendant failed to hold Plan assets in trust and instead transferred Plan assets to itself for its own benefit, causing injury to Plaintiffs, the Plan, and the Class as set forth in Paragraph 35 herein.

54.      Plaintiffs, the Plan, and the Class are entitled to monetary and equitable relief pursuant to 29 § U.S.C. §§ 1109(a), 1132(a)(2), and 1132(a)(3) as a result of this violation.

**<u>COUNT II</u>**
**Prohibited Transactions with a Party-in-Interest**
**29 U.S.C. § 1106(a)(1)(D)**

54.      Plaintiffs incorporate by reference the foregoing paragraphs as though fully stated herein.

55.      Defendant caused Plan assets to be transferred to itself for its own benefit, causing injury to Plaintiffs, the Plan, and the Class as set forth in Paragraph 35 herein.

56.     Plaintiffs, the Plan, and the Class are entitled to monetary and equitable relief pursuant to 29 § U.S.C. §§ 1109(a), 1132(a)(2), and 1132(a)(3) as a result of this violation.

<u>COUNT III</u>
**Prohibited Transactions with a Fiduciary**
**29 U.S.C. § 1106(b)(1), (b)(3)**

57.     Plaintiffs incorporate by reference the foregoing paragraphs as though fully stated herein.

58.     Defendant acted as a fiduciary of the Plan by exercising discretionary authority related to the management and administration of the Plan as well as the assets of the Plan.

59.     As described above, the Plan had a beneficial interest in the contract with Express Scripts given that payments for that service were paid by the Plan. As a result, the PBM contract was a plan asset. The rebates generated by that contract were also plan assets.

60.     Defendant dealt with Plan assets for its own benefit and account by transferring Plan assets to itself, causing injury to Plaintiffs, the Plan, and the Class as set forth in Paragraph 35 herein.

61.     Defendant received consideration for its personal account from Express Scripts in connection with the payment of rebates, each of which was a transaction involving the assets of the Plan.

62.     Plaintiffs, the Plan, and the Class are entitled to monetary and equitable relief pursuant to 29 § U.S.C. §§ 1109(a), 1132(a)(2), and 1132(a)(3) as a result of this violation.

<b><u>COUNT IV</u></b><br><b>Breach of ERISA's Fiduciary Standard of Care</b><br><b>29 U.S.C. § 1104(a)(1)</b>

63.     Plaintiffs incorporate by reference the foregoing paragraphs as though fully stated herein.

64.     Defendant was a fiduciary of the Plan.

65.     Defendant was acting in a fiduciary capacity when it retained the Plan's PBM, negotiated the terms of the PBM contract, and determined the allocation of all rebates generated by that contract.

66.     Defendants failed to follow a reasonable, prudent, loyal, and impartial process for hiring the PBM, negotiating its terms, and allocating Plan drug rebates, causing injury to Plaintiffs, the Plan, and the Class as set forth in Paragraph 35 herein.

67.     Plaintiffs, the Plan, and the Class are entitled to monetary and equitable relief pursuant to 29 § U.S.C. §§ 1109(a), 1132(a)(2), and 1132(a)(3) as a result of this violation.

<b><u>PRAYER FOR RELIEF</u></b>

WHEREFORE, Plaintiffs prays for judgment against Defendant and for the following relief:

A.     Certify Plaintiffs' authority to seek plan-wide relief on behalf of the Plan pursuant to 29 U.S.C. § 1132(a)(2);

B.     Alternatively, certify this action as a class action pursuant to Fed. R. Civ. P. 23, certify the named Plaintiffs as class representatives, and their counsel as class counsel;

C.     Declare that Defendant violated ERISA, 29 U.S.C. §§ 1103(a) and (c), 1104(a)(1), 1106(a)(1)(d), and 1106(b)(1);

17

D.     Order Defendant to make good to the Plan all losses and disgorge all profits resulting from its violations of ERISA;

E.     Impose a constructive trust on, and an accounting of, all drug rebates transferred to Defendant, and all proceeds of such drug rebates;

F.     Establish an equitable lien on any assets held by Defendant that are related to Defendant's ERISA violations and should, in equity, belong to the Plan;

G.     Order that Defendant be surcharged for the amount of drug rebates wrongfully retained with respect to the Plan and each Class member;

H.     Distribute the portion of funds recovered pursuant to Prayers D–G attributable to participant contributions (approximately 30%) to participants and their beneficiaries on a pro rata basis, based on the amount of premiums paid to the Plan during the relevant period;

I.     Appoint an independent fiduciary to develop and administer a fair and reasonable plan of allocation for the remainder of funds recovered pursuant to Prayers D–G so as to maximize the benefit to the Plan and its participants and beneficiaries;

J.     Order that Defendant provide other appropriate equitable relief to the Plan and the Class;

K.     Award Plaintiffs reasonable attorneys' fees and costs of suit incurred herein pursuant to 29 U.S.C. § 1132(g), and/or pursuant to the common fund method;

L.     Award prejudgment and post-judgment interest; and

M.     Award such other and further relief as the Court deems just and equitable.

Dated: January 25, 2023

Respectfully submitted,

 /s/ Andrew R. Frisch
Andrew R. Frisch
MORGAN & MORGAN, P.A.
8151 Peters Road, Suite 4000
Plantation, Florida 33324
Telephone: (954) WORKERS
Facsimile: (954) 327-3013
E-mail: AFrisch@forthepeople.com
Counsel for Plaintiff

/s/ Marc R. Edelman
MARC R. EDELMAN (pro hac vice motion
forthcoming)
Fla. Bar No. 0096342
MORGAN & MORGAN, P.A.
201 N. Franklin Street, Suite 700
Tampa, FL 33602
Telephone 813-223-5505
Fax: 813-257-0572
Email: MEdelman@forthepeople.com
Attorney for Plaintiff

/s/ Brandon J. Hill
BRANDON J. HILL (pro hac vice motion
forthcoming)
Florida Bar Number: 0037061
Direct Dial: 813-337-7992
LUIS A. CABASSA (pro hac vice motion
forthcoming)
Florida Bar Number: 053643
Direct No.: 813-379-2565
AMANDA E. HEYSTEK (pro hac vice motion
forthcoming)
Florida Bar Number: 0285020
Direct Dial: 813-379-2560
WENZEL FENTON CABASSA P.A.
1110 N. Florida Avenue, Suite 300
Tampa, Florida 33602
Main Number: 813-224-0431
Facsimile: 813-229-8712
Email: bhill@wfclaw.com

19

Email: lcabassa@wfclaw.com
Email: aheystek@wfclaw.com

**/s/ *Carl F. Engstrom*** _____

 **Carl F. Engstrom** (*pro hac vice motion forthcoming*)
 Minn. Bar No. 0396298
 **ENGSTROM LEE MCDONOUGH THOMPSON & THOMSON LLC**
 729 N Washington Ave, Suite 600
 Minneapolis, MN 55401
 Telephone: 612-699-4703
 cengstrom@engstromlee.com